UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IVAN LEE BECHTOL,

                Petitioner,                Case No. 1:09-cv-576

v.                                      Honorable Gordon J. Quist

JOHN PRELESNIK,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted in the Kalkaska County Circuit Court of first-degree home invasion, MICH. COMP. LAWS § 750.110a(2); conspiracy to commit first-degree murder, MICH. COMP. LAWS § 750.316(a) and MICH. COMP. LAWS § 750.157a; conspiracy to commit kidnapping, MICH. COMP. LAWS § 750.349 and MICH. COMP. LAWS § 750.157a; and attempted kidnapping, MICH. COMP. LAWS § 750.349 and MICH. COMP. LAWS § 750.92. On November 14, 2002, the trial court sentenced Petitioner to imprisonment of ten to twenty years for the first-degree home invasion conviction, life imprisonment without parole for the conspiracy to commit first-degree murder conviction, eighteen to twenty-eight years for the conspiracy to commit kidnapping conviction, and three to five years for the attempted kidnapping conviction. In his *pro se* petition, Petitioner raises four grounds for relief, as follows:

        I.        Petitioner was denied the effective assistance of counsel by his attorney's failure to object to the admission of evidence that Petitioner, when questioned by police after the alleged home invasion, invoked his right to remain silent and stated that he wanted a lawyer.

II.     Petitioner was denied his constitutional right to confront witnesses and present a defense by the government[']s threatening witnesses into not testifying.

III.    Petitioner is entitled to a new trial based on newly discovered evidence that the only witness to implicate him committed perjury at trial.

IV.     Petitioner was denied his due process right because the evidence at trial was insufficient and no rational trier of fact could be convinced beyond a reasonable doubt of the existence of every element of the offense.

Respondent has filed an answer to the petition (docket #8) stating that the grounds should be denied.

Petitioner filed a reply (docket #29.)  Upon review and applying the AEDPA standards, I find that

Petitioner's claims are procedurally defaulted or are without merit.  Accordingly, I recommend that

the petition be denied.

## **Procedural History**

### A.      Trial Court Proceedings

The state prosecution arose from the abduction and murder of twenty-year-old Jamie

Moran in Kalkaska County.  Moran's body was found in her partially submerged car in the Torch

River on September 5, 2001.  Two days before, in the early morning hours of September 3, 2001,

Petitioner and William Cron were involved in a home invasion and attempted abduction of the

victim from her boyfriend's trailer.  It was the prosecutor's theory that Petitioner conspired with

Cron, who had a previous relationship with the victim, to kidnap and murder the victim in order to

silence her concerning the perpetrators' drug dealings.  Petitioner was tried before a jury beginning

September 30, 2002 and concluding on October 5, 2002.[1]

---

[1]The trial transcripts will be referred to as follows:
Tr. I - Jury Trial Day 1, September 30, 2002
Tr. II - Jury Trial Day 2, October 1, 2002
Tr. III - Jury Trial Day 3, October 2, 2002
Tr. IV - Jury Trial Day 4, October 3, 2002
Tr. V - Jury Trial Day 5, October 4, 2002
Tr. IV - Jury Trial Day 6, October 5, 2002

Ira Henke testified that he and Brent Torrey resided in a mobile home at 88 Anderson Road in Kalkaska County in September 2001.  (Tr. I, 269.)  That summer, Torrey's girlfriend, Jessica Corner, lived on Quarterline Road in South Boardman with Bill Cron and Jamie Moran.  (Tr. I, 270.) Henke had known Moran for about three years and had previously dated her.  (Tr. I, 271.)  Moran and Cron dated during the time that they lived together and got engaged, but they broke up in early August after Cron was charged with criminal sexual conduct against Moran's sister.  (Tr. I, 271-72, 309-10.)  After Moran and Cron broke up, Henke and Moran started spending more time together. (Tr. I, 272.)  Torrey and Corner reserved a campsite on Gurnsey Lake on the Sunday night before Labor Day.  (*Id*.)  Henke and Moran arrived at the campsite at 8:00 or 9:00 p.m. Sunday night and stayed until about 3:00 a.m. Monday morning.  (Tr. I, 273-74.)  Moran left at about 11:00 p.m. and went to Ryan Hittle's house to get some cocaine from Cron.  (Tr. I, 274-75.)  Moran returned around 1:00 a.m. with about 3 grams of cocaine.  (Tr. I, 276, 316.)  Henke saw  Torrey, Corner and a couple of other people go off with Moran to use the cocaine.  (Tr. I, 317-18.)  At around 3:00 a.m., Henke and Moran went back to Henke and Torrey's trailer to watch movies.  (Tr. I, 273.)

Henke testified that while they were at his place watching movies, he and Moran did some lines of cocaine.  Henke heard Moran talking on her cell phone in the bathroom.  (Tr. I, 277.) He believed that she was talking to Cron.  (*Id*.)  They went to bed in Henke's bedroom just after 6:00 a.m.  (Tr. I, 278, 280.)  About fifteen minutes later, they were awoken by Torrey's dog barking outside.  (Tr. I, 278-79.)  Henke got up to investigate and found Cron in the trailer.  (Tr. I, 279.) Cron grabbed Henke by the shirt and asked where Moran was.  When Henke told Cron to get out of his house, Cron ran to Henke's bedroom and started yelling at Moran.  (Tr. I, 280-81.)  Henke attempted to call 911 from Torrey's bedroom, but Cron ran in and pulled the cord out of the phone.

(Tr. I, 281.)  Cron dumped out Torrey's duffel bag and asked, "Where's my shit?"  (Tr. I, 282.)

Henke did not know what Cron was talking about at the time, but later concluded that he must have

been looking for the cocaine that he had given Moran the night before.  (*Id*.)  After grappling with

Cron and getting him pinned down, Henke told Moran to call 911.  (Tr. I, 283.)  Henke then looked

up and saw Petitioner standing in the doorway of the bedroom.  (*Id*.)  Henke told Petitioner that he

would let Cron go if Petitioner got him out of the trailer.  (Tr. I, 329.)  Petitioner told Henke to let

go of Cron.  (Tr. I, 285.)  When Henke released Cron, he got up and grabbed Henke.  When Henke

tried to elbow him in the head, Cron let go and ran to Henke's room where he assaulted Moran.  (Tr.

I, 287.)  Cron grabbed Moran by the arm and said that she was leaving with him whether she liked

it or not.  Moran told Cron that she did not want to go with him and Henke held on to her so Cron

could not take her with him.  Cron eventually gave up and left with Petitioner.  (Tr. I, 288, 292.)

       Henke testified that Petitioner never tried to grab Moran, but Henke could have held

Cron down until the police arrived if not for Petitioner's interference.  (Tr. I, 290-91, 330, 337.)

Moran was very upset and frightened after the incident.  (Tr. I, 292.)  Moran told Henke that she had

arranged with Cron to sell the cocaine he gave her on Sunday night and to pay him an agreed upon

amount.  However, Moran actually planned to use some of the cocaine and sell the rest without

giving any money back to Cron because he owed her a lot of money.  (Tr. I, 293-94.)  Henke was still

on the phone with the 911 operator when Torrey and Corner arrived.  (Tr. I, 294.)  Moran stayed with

Henke until she took him to work on Tuesday morning at 7:00 a.m.  (Tr. I, 295.)  That was the last

time he saw her.  (*Id*.)

       Brent Allen Torrey testified that he and Henke planned a camping trip to Gurnsey

Lake over the Labor Day weekend with some other people, including Jessica Corner, Ricky Phillips

and Jamie Moran.  (Tr. II, 34, 38.)  Corner was Torrey's girlfriend at the time and lived with Jamie
Moran and Bill Cron on Quarterline Road.  (Tr. II, 34, 38.)  Sometime after midnight, Torrey did a
line of cocaine in Moran's car.  (Tr. II, 67, 72-73.)  Moran provided the cocaine to Torrey and also
was using it.  (Tr. II, 67, 69-70.)  Henke and Corner also were drinking that night, but Torrey did not
see them use cocaine.  (Tr. II, 71-72.)  Torrey, Corner and Phillips stayed all night from Sunday,
September 2, until Monday, September 3.  (Tr. II, 35.)  The other participants, including Moran and
Henke, left around 4:00 a.m.  (Tr. II, 37-38.)  Moran had her own car and Henke was riding with her.
(Tr. II, 39.)  At some point during the early morning hours of September 3, Moran left the party and
then came back.  (Tr. II, 69-71.)

       Torrey testified that at approximately 6:00 a.m. on September 3, Bill Cron and
Petitioner drove past their campsite and parked about 150 yards away.  (Tr. II, 42-43, 46.)  Torrey
knew Petitioner from school, but had not seen him in three or four years.  (Tr. II, 74.)  Torrey met
Cron through Moran and Corner and had only known him for about three months.  Cron and
Petitioner got out of the car and walked to the entrance of the campground.  (Tr. II, 44.)  Torrey
walked over to see what they were doing and Cron asked Torrey if Moran was at the campsite.  (Tr.
II, 45.)  Torrey told him "no," that she already had gone home to her house, which was not entirely
true, but Torrey did not want them to go looking for Moran at he and Henke's house.  Cron then
asked if Moran "was f----ing anybody."  (*Id*.)  Torrey responded in the negative.  (Tr. II, 47.)
Petitioner asked if Moran was in Phillip's tent in a tone that prompted Torrey to say, "Don't be a
tough guy."  (Tr. II, 48, 77.)  As Corner walked up to the three men, Cron announced that they had
to go and he and Petitioner went back to the car and left.  (Tr. II, 49.)  After Torrey told Corner who
the men were, she wanted to leave because she did not want to be out in the woods with Bill Cron

around.  (Tr. II, 51-52.)  They left the campsite a few minutes later and returned to Torrey and

Henke's trailer, which was about a ten minute drive.  (Tr. II, 53.)  When they arrived at the trailer,

Henke told Torrey that someone had just broken into the house.  (Tr. II, 55.)

   Brenda Kay Standfest testified that she worked with Moran at the Signature Salon in

Traverse City for three years.  (Tr. II, 89-92.)  Standfest was aware that Moran and Cron were dating

during the summer of 2001.  (Tr. II, 92.)  In early September, 2001, Moran wanted to break up with

Cron, but he was not taking it well.  (Tr. II, 92-93.)  While they were at work on the morning of

September 4, 2001, Moran told Standfest that she changed her cell phone number because she

wanted to make clean break from Cron.  (Tr. II, 93-94.)  Cron somehow got Moran's new number

and made repeated calls to her cell phone while she was at work.  (Tr. II, 96.)  Standfest answered

Moran's phone twice that day and spoke to Cron.  (Tr. II, 97.)  According to Standfest, Cron tried

to disguise his voice, but she knew it was him.  (Tr. II, 96-97.)  During the second call, Cron told

Steadfast that, "he had too much to lose, that he had too much going on with the police and he just

needed to see her [Moran] one more -- last time to say his goodbyes."  (Tr. II, 98.)  Moran and

Standfest were afraid of Cron and believed he was in the area, so Moran called 911.  (Tr. II, 97, 99-

100.)  After the police came, Moran and Standfest left the salon.  Moran said that she was going to

Jessica Corner's house.  (Tr. II, 101.)  While Moran was driving, she called Standfest and told her

that she had a feeling  Petitioner was following her, so Moran and Standfest met at a Shell gas station

at Hammond and Three Mile.  (Tr. II, 102.)  At the gas station, Moran told Standfest that Cron had

called again and wanted to meet her on Supply Road.  (Tr. II, 103.)  Moran and Standfest discussed

that Moran would be safe from Cron at her parents' house because Moran's sister had a personal

protection order against Cron.  (*Id*.)  Moran was supposed to call Standfest when she got to her

parents' house, but Standfest never heard from her.  (Tr. II, 104-105.)  Moran told Standfest that

Cron and another man tried to kidnap her on September 3, but she did not mention the other person

by name.  (Tr. II, 107.)

Jessica Corner testified that she had known Moran since sixth grade.  (Tr. II, 109.)

Corner and Moran moved into a residence on Quarterline Road on June 1, 2001.  (Tr. II, 110.)  Bill

Cron lived with them until August.  Moran's sister, Sarah, also stayed at the residence during the

time that Cron lived there.  (*Id*.)  Corner knew Cron for a few months before they moved into the

house, but she did not like him because he scared her.  (Tr. II, 111.)  In July and August, Moran and

Cron started fighting a lot and Moran became fearful of him.  (Tr. II, 112.)  At the time of the camp

out over Labor Day weekend, Corner and Moran were staying with Henke and Torrey because they

were afraid of Cron.  (Tr. II, 113-14.)  Corner was at the Gurnsey Lake campground from Sunday

nigh until Monday morning.  (Tr. II, 114.)  Moran arrived at the campground around dusk on

Sunday.  At some point, she left to go see Cron and then came back with some cocaine.  (Tr. II, 115.)

Corner had a line of cocaine and five or six cocktails over the course of the night.  (Tr. II, 116, 136.)

Corner, Torrey and Phillips were the only ones left at the campsite when Cron arrived the next

morning around 6:00 a.m.  (Tr. II, 116.)  According to Corner, there was another man with Cron, but

she did not get close enough to see who he was.  (Tr. II, 120-21.)  Corner testified that Cron

freightened her and that she wanted to go find Moran.  (Tr. II, 121.)

Corner testified that they left the camp ground right after Cron and drove as fast as

they could back to Torrey and Henke's trailer.  (Tr. II, 123.)  By the time they arrived, Cron already

had been there and left.  (Tr. II, 124.)  Corner and Moran stayed at the trailer on Monday night.  (Tr.

II, 125.)  Moran left for work on Tuesday morning before Corner got up, but Moran called her at

6:00 or 7:00 p.m. to give Corner her new cell phone number.  (Tr. II, 126-27.)  Moran was upset because Petitioner had been calling her all day.  (Tr. II, 128.)  Moran called Corner again and said that she was by the Little Red School House and was on her way to her parent's house.  (*Id*.)  While they were talking, Moran got another call on her cell phone and clicked over to answer the call. When Moran clicked back to Corner, she was screaming.  Corner could hear a man's voice that sounded like Cron, but she could not hear what he was saying.  (Tr. II, 128-29.)  Corner did not know Petitioner and had never seen him before the incident over Labor Day weekend.  (Tr. II, 140, 148.)

Danny Lee Davis testified that he was in the same cell block with Petitioner in the Kalkaska County Jail in November 2001.  (Tr. II, 195, 241.)  Davis testified that the prosecutor's office offered him some leniency in exchange for his cooperation and testimony in this case.  (Tr. II, 193.)  Davis pleaded guilty to one count of third-degree criminal sexual conduct and was sentenced to imprisonment of twenty-four months to fifteen years. (Tr. II, 194.) Davis was ashamed of the charges against him, so he told Petitioner that he was in jail on drug charges. (Tr. II, 197-98.) Petitioner told Davis that he was in jail for home invasion involving Jamie Moran.  (Tr. II, 198.) Over the next couple of day, Petitioner asked Davis if he could "keep a secret" and began offering more details about the events leading up to Moran's murder.  (Tr. II, 201-03.)  Petitioner stated that he and Cron went over to the trailer to get Moran.  (Tr. II, 205, 260-61.)  When Petitioner heard a commotion coming from inside the trailer, he went inside to get Cron.  (Tr. II, 204, 259-63.) Petitioner explained that he and Cron were worried about Moran turning them in for dealing drugs. (Tr. II, 201.)  After the failed attempt to take Moran from the trailer, they decided to get her coming home from work.  (Tr. II, 204-05, 262-63.)  According to Petitioner, Cron and a friend planned to wait by her workplace, while Petitioner and a friend of his waited over by her house in case she got

past Cron.  (Tr. II, 204.)  The plan was to take Moran to a park in Rapid City, give her a lethal dose

of drugs and make it look like she drove herself into the river.  (Tr. II, 204-05.)  Petitioner told Davis

that they met in the park as planned, but Cron left with Moran when another car pulled into the

parking lot.  (Tr. II, 206.)  At that point, Moran was drugged, but alive. (*Id*.)  Petitioner indicated that

the drugs were provided by Ryan Hittle, but Hittle refused to deliver the lethal dose himself.  (Tr.

II, 206, 217-18, 258.)  Petitioner's cellmate, Scott Riplow also was present when Petitioner told

Davis about the home invasion and the plan to kill Moran.  (Tr. II, 202, 242-32.)

        Davis testified that about a week after telling Davis about Moran's murder, Petitioner

approached Davis and said, "You better not utter a word . . . . I know you've got a wife on the

outside," which Davis took as a threat.  (Tr. II, 209, 243.)  After consulting with his wife, Davis

decided to contact the police in late January 2002, to tell them what Petitioner had told him about

Jamie Moran's murder.  (Tr. II, 211, 240.)  On cross-examination, Davis testified that he was at the

Kalkaska County courthouse on September 10, 2001, the same day that Cron had a bond revocation

hearing.  Davis maintained that he only heard testimony about Cron's attempt to kidnap Moran from

Henke's residence on September 3.  (Tr. II, 225-33.)  Davis testified that he did not ask for a deal

when he provided the information to police, but asked to be released on bond so that he could protect

his wife from retaliation.  (Tr. II, 252, 277-78.)

        State Police Trooper Thomas George, Jr. testified that he responded to the call

regarding the home invasion at Henke and Torrey's trailer at approximately 6:45 a.m. on September

3.  (Tr. II, 292-93.)  By the time George arrived the suspects were gone, but George spoke with

Henke, Moran and Torrey.  (Tr. II, 294.)  Moran's accounts of what had occurred was consistent with

Henke's trial testimony.  (Tr. II, 297.)  After they were unsuccessful at locating Cron at his residence,

George and two other officers went to Petitioner's residence.  (Tr. II, 298.)  While the officers were

outside Petitioner's house, Petitioner approached on foot in a very aggressive manner and had his hand behind his leg.  (Tr. II, 300.)  Because the officers feared that Petitioner could have a weapon, they drew their guns and told him to stop.  (*Id*.)  Petitioner was unarmed and the officers placed him under arrest.  (Tr. II, 301.)  Two days later, at about 6:40 a.m. on September 5, George responded to a call about a stolen car in Rapid City.  (Tr. II, 302-03.)  The car was later recovered in the Bear Lake area behind Dingman's Bar.  (Tr. II, 303.)  Later that evening, George located the keys belonging to the stolen car near the Cron home.  (Tr. II, 304-05.)  Detective Simpson also instructed George to retrieve letters from the Cron family mini-van.  (Tr. II, 306.)  The letters were written on yellow paper and were inside a white envelope.  (Tr. II, 307.)

State Police Trooper Steven Porter testified that he was with Trooper George when Petitioner was arrested at his home on September 3, 2001.  (Tr. III, 5.)  Porter and Trooper Cunningham later participated in the search for Jamie Moran during the late hours of September 4 and early morning hours of September 5.  (Tr. III, 7.)  They went to Petitioner's residence at 1:25 a.m. on September 5.  Petitioner was home and came out of the house to speak with the officers.  (Tr. III, 8.)  When the officers asked Petitioner if he had seen Cron or Moran, he responded that Cron had gone down state.  (*Id*.)  When asked how he knew that, Petitioner would not give a specific source, but said that was what he had heard.  (Tr. III, 8-9.)

Harry Shipp testified that he was the sergeant in charge of the Kalkaska County Jail. Shipp testified that inmate Danny Davis was assigned to C Block, cell C-6, from November 8 through December 23, 2001.  (Tr. III, 19-21.)  Ryan Hittle was in C Block, cell C-6, from November 27, 2001 through February 6, 2002.  (Tr. III, 22-23.)  Petitioner was in C Block, cell C-5, from October 8, 2001 through July 11, 2002.  (Tr. III, 25.)  Charles Lee was in C Block from November 29 through December 31, 2001.  (Tr. III, 24.)  Scott Riplow also was in C Block at the same time as

Petitioner and Davis.  (Tr. III, 33.)  Nate Sizemore shared a cell with Ryan Hittle in C block from January 18, 2002 until February 2, 2002.  (Tr. III, 24.)  Shipp also testified that three 911 calls came from Brent Torrey's residence between 6:43 a.m. and 6:49 a.m. on September 3, 2001, (Tr. III, 31-32.)  In addition, Shipp confirmed that Petitioner bonded out of the jail at 5:40 p.m. on September 4, 2001.  (Tr. III, 28-29.)

Antrim County Sheriff's Department Sergeant James Janisse testified that dispatch received a call around 7:00 a.m. on September 5, 2001, that a vehicle was in the Torch River.  (Tr. III, 38.)  Janisse responded and saw a vehicle submerged about three feet in the river.  (Tr. III, 39.)  Janisse found Moran's dead body floating inside the car and pulled her to shore.  (Tr. III, 38, 43.)  Janisse could see tire tracks leading directly into the river.  (Tr. III, 40.)

Matthew Alan Cron, Bill Cron's younger brother, testified that he was in jail serving a sentence unrelated to this case.  (Tr. II, 54.)  Matthew testified that he went to run some errands with his brother in the late-morning or early afternoon of Tuesday, September 4, 2001.  (Tr. II, 55.)  Matthew drove Bill to Ryan Hittle's house and waited in the car for fifteen or twenty minutes while Bill was inside.  (Tr. II, 56-57.)  On the way to Hittle's, Bill mentioned that the police might be looking for him in connection with a home invasion.  (Tr. II, 79.)  After that, Matthew and Bill went to some stores in Traverse City where they purchased a pair of work gloves, a pair of black and white baseball gloves, a fake mustache and side burns, hair dye, a permanent marker, pens, a pack of legal pads and magic markers.  (Tr. II, 57-59.)  They went to a friend's trailer in Traverse City where Bill colored his hair from sandy brown to black and put on the mustache and side burns.  (Tr. II, 59-60, 94.)  Bill did not tell Matthew why he wanted to change his appearance or what he was planning to do.  (Tr. II, 80, 94.)  Bill took Matthew's car and left by himself at about 6:00 p.m. on September 4.

(Tr. II, 61.)  Matthew stayed at his girlfriend's house in Traverse City.  Later that evening, around 8:00 or 9:00 p.m., Bill called Matthew and told him that his car was parked by Ace Builders, which was very close to Signature Salon.  (Tr. II, 62, 101.)  When Matthew arrived at the location of his car, Moran's car was parked behind Signatures Salon, where she worked.  (Tr. II, 63, 119.)  Matthew saw two police officers standing outside the front door of Signatures Salon talking to Moran.  (Tr. II, 101.)  Earlier that day, Bill told Matthew that he had a key to Moran's car and planned to get his stuff back.  (Tr. II, 64, 123.)

Matthew testified that he did not hear from Bill again until the early morning hours of September 5, when Bill called and asked Matthew to pick him up at the bar by Bear Lake.  (Tr. II, 66-67.)  When Matthew arrived, Bill was cold because he was wet from the waist down.  (Tr. II, 69.)  Bill told Matthew to go wipe his fingerprints off the car he had stolen and to get rid of the keys.  (Tr. II, 69-70.)  Matthew followed Bill's instructions, but later helped the police recover the keys.  (Tr. II, 71.)  After that, Matthew and Bill went home, where Bill instructed Matthew to burn several items in the fireplace, including the shoes that they had been wearing, Bill's clothes, the pads of paper, pens, etc.  (Tr. II, 72, 108.)  Bill also told Matthew to rake the ground outside their house to get rid of any shoe impressions.  (Tr. II, 73.)  At about 5:00 a.m., Matthew left to drive Bill to their brother's house in Grand Haven.  (Tr. II, 73, 109.)  On the way, Bill gave Matthew a set of car keys and told him to throw them out of the window.  (Tr. II, 74.)  One of the keys was a house key and the other was a Honda car key.  (*Id*.)  Before Matthew left to return home, Bill gave him an envelope with papers inside and told him to mail it to his lawyer.  (Tr. II, 75, 117.)  Matthew never read what was inside the envelope, which he ended up giving to police.  (Tr. II, 76.)  Matthew testified that he knew Petitioner because they had been friends, but he did not know that Bill and Petitioner were

- 12 -

friends at the time of Moran's death.  (Tr. II, 77, 80.)  Bill did not mention Petitioner to Matthew on

September 4 and 5.  (Tr. II, 80, 103, 113.)

Michelle Yvonne Dunkerley, the Laboratory Director at the Michigan State Police

Sterling Heights Laboratory, testified as an expert in determining the content or authenticity of

written documents.  Dunkerley conducted an indented writing examination of various pages from

a yellow legal pad.  (Tr. II, 179-84.)  The recovered text consisted of letters signed by Jamie Moran

in which she made statements exculpating Cron in the criminal sexual conduct charges against him

concerning her sister.  The letter also included statements exculpating Cron and Petitioner with

regard to the criminal charges arising from the incident at Henke and Torrey's trailer on September

3.  (Tr. II, 184-88.)

Michigan State Police Detective Richard Simpson was the lead investigator in the

Moran homicide case.  (Tr. III, 141-42.)  After interviewing Matthew Cron on the evening of

September 5, the police recovered several pieces of evidence, including letters written by Cron to

his attorney, which were found in the family mini-van.  (Tr. III, 145.)  Simpson later received three

additional pages from Gerald Chefalo, who had been Cron's lawyer.  (Tr. III, 146.)  Simpson also

reviewed the cell phone records produced by Centurytel.[2]  (Tr. III, 149-50.)  Simpson made a

summary compilation of the calls made to and from Cron's cell phone from 12:29 a.m. until 9:48

a.m. on September 3.  (Tr. III, 150, 160.)  According to cell phone records, Cron initiated a call to

Moran's cell phone at 12:29 a.m. that lasted about thirty seconds.  (Tr. III, 159.)  The records also

showed that Cron blocked his phone number from showing on Moran's caller ID when he placed

---

[2]Diane Takens, an employee of Centurytel, authenticated Cron's cell phone records from September 2 through
6, 2001.  (Tr. II, 155-173.)

the call.  (Tr. III, 159-60.)  Cron then made a call to Ryan Hittle's number at 12:32 a.m. that lasted for just over one minute.  (Tr. III, 160.)  Cron made six calls to Ryan Hittle between 5:02 a.m. and 6:13 a.m., that lasted anywhere from thirty-nine seconds to over four minutes.  (Tr. III, 161.)  Those phone calls would have been made just before Cron and Petitioner arrived at the Gurnsey Lake campground.  (*Id.*)

Detective Simpson testified that he interviewed Petitioner on October 19, 2001, at the Kalkaska County Prosecutor's Office.  (Tr. III, 162.)  According to Simpson, Petitioner gave inconsistent stories about what occurred on the night of September 2 and early morning hours of September 3.  (Tr. III, 163.)  Petitioner eventually admitted that he went to a party at Hittle's house on the night of September 2, which was attended by many other people, including Bill Cron.  (*Id.*)  Petitioner told Simpson that he never saw Moran at Hittle's house that night.  (Tr. III, 190).  Petitioner said that he and Cron went to the campground at around 5:00 a.m. because Cron knew about a party there.  (Tr. III, 164.)  When they got to the campground, Petitioner waited in the car while Cron talked to Brent Torrey.  Petitioner then went up to Torrey, but when Torrey said, "She's not here," Petitioner went back to the car.  (Tr. III, 166.)  Petitioner wanted to go home after that, but Cron drove recklessly to Torrey and Henke's trailer, where Moran's car was parked outside.  (*Id.*)  Petitioner told Simpson that, on the way from the campground to the trailer, Cron made cell phone calls to Moran's residence on Quarterline Road, Brent Torrey and Moran's cell phone.  (Tr. III, 182-85.)  However, Simpson knew from Cron's phone records, that Cron made six phone calls to Ryan Hittle, and no one else, during that period.  (Tr. III, 182-84.)

Simpson testified that Petitioner told him that Cron rushed up to the trailer and entered without knocking.  (Tr. III, 167.)  A few minutes later, Petitioner heard screaming, so he got

- 14 -

out of the car and went inside.  Petitioner could hear Moran calling 911 and urged Cron to leave.
(*Id.*)  According to Petitioner, Cron took a bag of drugs into the house with him because he was
afraid Petitioner might steal it.  When Petitioner was in the house, Cron allegedly had dropped his
drugs and asked Petitioner to help him find them.  Petitioner found the drugs and gave them back
to Cron.  (Tr. III, 168.)  After the incident, Cron made statements to Petitioner that "[S]he's gonna
die; that he can't believe she had done this to him."  (Tr. III, 168.)

Simpson testified that Petitioner claimed that he never talked to Cron again after his
arrest on September 3.  (Tr. III, 171.)  Petitioner was in jail during the day on September 4, while
Matthew and Bill Cron were out shopping.  (Tr. III, 226.)  Petitioner stated that he was released from
jail at 5:45 p.m. on September 4 and was at Ryan Hittle's house until 12:30 a.m. on September 5.
(Tr. III, 171.)  Troopers Cunningham and Porter went to Petitioner's house after 1:00 a.m. looking
for Moran.  (*Id.*)  It was not until after the information received from Danny Lee Davis that Simpson
started to consider charges against Petitioner for conspiracy to commit murder.  (Tr. III, 177-78.)
However, even before Davis provided information, Simpson was concerned about why Petitioner
was not telling the truth.  (Tr. III, 231.)  Davis' statement was supported by information from Scott
Riplow and Charles Lee.  (Tr. III, 232.)

Scott Riplow testified that he and Petitioner were cellmates in the Kalkaska County
Jail in November 2001.  (Tr. IV, 4-5.)   Riplow testified that he never overheard any conversation
between Petitioner and Danny Davis or Ryan Hittle and Davis regarding the kidnapping and murder
of Jamie Moran.  (Tr. IV, 8-12, 14.)  Riplow believed that Davis was out to get Petitioner because
Petitioner confronted him about the fact that Davis was not really in jail on drug charges as
represented by Davis.  (Tr. IV, 16, 32.)  Riplow was at the Osceola County jail from November 29

through March 17, 2001, so he could not have heard any conversations between Petitioner and Davis that occurred during that time. (Tr. IV, 18.) Riplow admitted to giving previous statements and testimony that Petitioner told him that, before the home invasion on September 3, Cron said that he was going to kill Moran. (Tr. IV, 20-23.) Petitioner told Riplow that Cron wanted to go to Henke's residence to get some drugs or money. (Tr. IV, 25-26.) Petitioner also said that he had not told the police everything. (Tr. IV, 26-28.) Riplow testified that he disliked Davis from the time he arrived at the jail. (Tr. IV, 35-36.)

Nathan Sizemore testified that he went with Bill Cron and Ryan Hittle to Flint to buy crack on September 2, 2001, but came back empty handed. (Tr. IV, 54, 66, 77.) They returned to Hittle's house at about 2:00 a.m. the following morning. (Tr. IV, 55.) Several people were at Hittle's house, including Petitioner and Moran. (Tr. IV, 55-56, 63.) Sizemore testified that he observed Cron yelling at Moran about something. (Tr. IV, 56.) Sizemore denied telling a detective that Petitioner also went on the trip to Flint. (Tr. IV, 67, 79.) Sizemore was in prison at the time of trial for two counts of uttering and publishing. (Tr. IV, 72.)

Petitioner testified that he was nineteen-years-old in September, 2001. (Tr. IV, 82.) On Sunday, September 2, Petitioner worked during the day for R&G Building and planned to spend the evening partying and hanging out with his friends. (*Id.*) Petitioner had been drinking alcohol and using drugs, including OxyContin, ecstacy, marijuana, cocaine and crack cocaine, for the past four years. (Tr. IV, 83.) Petitioner got his drugs from several sources, including Ryan Hittle and Bill Cron. (Tr. IV, 84, 150-51.) Petitioner had known Hittle for four or five years, but had just met Cron at Hittle's house a couple of weeks before Moran's death. (Tr. IV, 86.) Before September 2, 2001, Petitioner had only a couple of brief encounters with Bill Cron and had not discussed anything

- 16 -

relating to a plan to kidnap or murder Jamie Moran.  (Tr. IV, 91, 150.)  Petitioner had a gathering at his trailer on September 2, during which he consumed almost a fifth of Captain Morgan's, marijuana, cocaine and crack.  (Tr. IV, 90.)  Petitioner testified that his use of drugs and alcohol affected his memory of certain events.  (Tr. IV, 91.)  Petitioner went to Hittle's house sometime between 10:00 p.m. and 1:00 a.m., but he could not recall how he got there.  (Tr. IV, 92.)  Petitioner admitted that he lied to Detective Simpson when he told him that he only had used marijuana because he did not want to get in trouble for his drug use.  (Tr. IV, 93, 95.)  He also lied to Simpson when he said that only Petitioner, Hittle and Cron were at Hittle's house that night because he did not want to get anyone else involved.  (Tr. IV, 93-94, 138.)  Petitioner testified that Kendra Hittle, Sue Hittle, Nathan Sizemore, Lindsey Rowell and Doug Stenka also were at Hittle's house that night, but he did not see Moran.  (Tr. IV, 94, 96.)  Sometime during the early morning hours, Cron asked Petitioner to go to another party at Gurnsey Lake.  (Tr. IV, 95.)  Petitioner agreed to go with him because Cron had some crack cocaine and they were running out at Hittle's house.  (*Id*.)

Petitioner testified that he and Cron used crack cocaine on the way to Gurnsey Lake. (Tr. IV, 106.) Cron did not mention anything about Moran during the drive to the lake.  (Tr. IV, 107-08.)  Cron had his cell phone and told Petitioner that he was trying to call his house on Quarterline Road.  (Tr. IV, 109-10.)  When they arrived at the camp ground, they drove around until they found the location of the party.  Cron parked a little ways from the site of the party and got out of the car while Petitioner waited.  Cron came back to the car, drove around the loop of campsites and made a couple of phone calls, but Petitioner did not know whom he called. (Tr. IV, 112.)  After Cron stopped again near the site of the party, Petitioner got out to investigate.  He saw two people at the campsite, including Brent Torrey.  (*Id*.)  Petitioner asked Torrey if there was a party going on, to

- 17 -

which Torrey responded, "She's not here." (Tr. IV, 112-13.)  Torrey was looking at Cron when he

made that statement.  (Tr. IV, 113.)  At that point, Petitioner and Cron went back to the car and left.

(Tr. IV, 113-14.)

Petitioner testified that he asked Cron to take him home because he wanted to get

some sleep before work, but Cron said that he had one more stop to make.  (Tr. IV, 114.)  Cron drove

to a house on Anderson Road.  They continued to use marijuana and crack cocaine on the way.  (Tr.

IV, 115.)  Cron did not tell Petitioner that he intended to break into the trailer or that he intended to

kidnap Moran.  (Tr. IV, 116.)  When they pulled into the driveway at 6:00 or 7:00 a.m., Cron said,

"There's her car," but Petitioner did not know who he was talking about.  (*Id*.)  Cron got out of the

car with a large baggie containing smaller baggies of cocaine and crack cocaine.  (Tr. IV, 118, 121.)

Cron did not tell Petitioner what he intended to do with the drugs.  (Tr. IV, 118.)  Petitioner watched

Cron as he tried one locked door and then entered the house through another door.  (Tr. IV, 116.)

When Petitioner heard screaming coming from the house, he went inside to investigate.  (Tr. IV,

118.)  Petitioner went to the back of the trailer, where he saw Jamie Moran on the bed, and Henke

and Cron wrestling on the floor.  (Tr. IV, 118-19.)  As he came down the hall, Petitioner could hear

Cron telling Moran that she was not calling 911.  (Tr. IV, 119-20.)  Petitioner told Henke to let go

of Cron so Petitioner could get him out of the trailer.  (Tr. IV, 119.)  After Henke let go and ran out

of the room, Cron told Petitioner that he lost "his shit" and asked him to help him find it.  (Tr. IV,

121.)  According to Petitioner, the floor was cluttered with clothes and other items, but he found the

bag of drugs and gave them back to Cron.  (*Id*.)  As Petitioner and Cron were leaving the trailer,

Cron said, "I can't believe she done that to me, she's going to pay for what she's done."  (Tr. IV,

122.)  Cron also stated, "I'm going to kill that bitch for what she's done to me."  Petitioner testified

- 18 -

that he told Cron that he was not going to do that and tried to calm him down by giving him some crack to smoke. (*Id*.) Cron drove to Petitioner's house and dropped him off. (Tr. IV, 123.)

Petitioner testified that he went out for a while and then came home to find three police cars in his driveway. Petitioner did not want to pull up in his truck because he had cocaine, crack and marijuana in his possession, so he parked next door at his mother's house. (Tr. IV, 124.) Petitioner was curious to know what the police wanted, so he walked through the woods to his house, where he was arrested and taken to the Kalkaska County Jail. (Tr. IV, 125.) Petitioner was released on bond around 5:00 p.m. on September 4. (Tr. IV, 127-28.) Petitioner went home for a couple of hours and then drove over to Ryan Hittle's house between 7:00 and 9:00 p.m. (Tr. IV, 129.) Petitioner stayed at Hittle's house until he went home at 12:15 or 12:30 a.m. on September 5. (Tr. IV, 132.) Petitioner testified that he did not have any contact with Cron while he was at Hittle's and was not aware of Hittle having any contact with Cron. When Petitioner got home, he watched TV and did more drugs. (*Id*.) The police arrived around 1:00 a.m. asking if he had seen Cron or Moran. (Tr. IV, 134.) Petitioner told the police that he had not seen them that night and they left. While Petitioner was at work the following day, he heard that Moran's car had been found in the Torch River. (*Id*.)

A couple of weeks after Moran's death, Petitioner was arrested for drunk driving and his bond was revoked. (Tr. IV, 136.) Petitioner was incarcerated at the Kalkaska County Jail following the bond revocation. (Tr. IV, 137.) Petitioner admitted that he was not entirely truthful when Detective Simpson came to talk to him about the home invasion. (*Id*.) Petitioner remembered being in the same cell block with Danny Davis, but denied ever having a direct conversation with him. (Tr. IV, 139-40.) Davis was present when Petitioner talked to a couple of other inmates about

the home invasion, which was the reason for Petitioner's incarceration at the time. (Tr. IV, 140-41.) According to Petitioner, the account of the home invasion that he told in jail was the same as the account that he gave at trial. (Tr. IV, 141.) Petitioner testified that Davis told the inmates in the cell block that he was there on marijuana charges. (Tr. IV, 142.) Petitioner later found out that Davis actually was in jail for criminal sexual conduct. Petitioner did not like Davis from the beginning and did not want to have anything to do with him after he found out what Davis had done. (Tr. IV, 143.) Petitioner was angry at Davis for lying, and he called Davis names, like "baby raper." (Tr. IV, 144.) Petitioner testified that he never had a conversation with Hittle concerning anything related to Jamie Moran while Davis was present. (Tr. IV, 145.) The jail inmates saw television news stories and newspaper stories about Moran's murder. (Tr. IV, 146-47.) Petitioner also denied threatening Davis' wife or even knowing that he had a wife. (Tr. IV, 148.)

Petitioner denied having any drug dealings with Jamie Moran and claimed that he had only seen her on two occasions - once when she was living with Cron on Quarterline Road and for the second time on September 3 in Torrey and Henke's trailer. (Tr. IV, 149, 152-53.)

Defense counsel intended to call Ryan Hittle and Charles Lee as witnesses, but they both invoked their Fifth Amendment rights to remain silent.

At the conclusion of trial on October 5, 2002, the jury found Petitioner guilty on all charges. (Tr. VI, 8.) On November 14, 2002, Petitioner was sentenced to imprisonment of ten to twenty years for the first-degree home invasion conviction, life imprisonment without parole for the conspiracy to commit first-degree murder conviction, eighteen to twenty-eight years for the conspiracy to commit kidnapping conviction, and three to five years for the attempted kidnapping conviction. (Sentencing Tr., 17, docket #22, 54-56.)

**B.       Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which

was filed by counsel on July 1, 2004, raised the following grounds for relief:

I.      WAS DEFENDANT DENIED HIS CONSTITUTIONAL RIGHT TO
        CONFRONT WITNESSES AND PRESENT A DEFENSE BY THE
        PROSECUTION'S THREAT TO PROSECUTE CHARLES LEE FOR
        EXTORTION AND THE COURT'S SUBSEQUENT RULING THAT LEE
        WAS ENTITLED TO INVOKE HIS PRIVILEGE AGAINST SELF-
        INCRIMINATION.

II.     WAS DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF
        COUNSEL BY HIS ATTORNEY'S FAILURE TO OBJECT TO THE
        ADMISSION OF EVIDENCE THAT DEFENDANT, WHEN
        QUESTIONED BY POLICE AFTER THE ALLEGED HOME INVASION,
        INVOKED HIS RIGHT TO REMAIN SILENT AND STATED THAT HE
        WANTED A LAWYER.

III.    DID PLAIN ERROR OCCUR AFFECTING DEFENDANT'S
        SUBSTANTIAL RIGHTS WHERE PLAINTIFF INTRODUCED INTO
        EVIDENCE A CLAIMED TESTIMONIAL STATEMENT BY JAMIE
        MORAN AS AN EXCITED UTTERANCE (OVER DEFENDANT'S
        HEARSAY OBJECTION).

IV.     DID THE SENTENCING COURT ERR BY ORDERING THE SENTENCE
        FOR HOME INVASION 1st TO BE SERVED CONSECUTIVELY WITH
        THE SENTENCES FOR CONSPIRACY TO KIDNAP AND MURDER
        UPON FINDING THAT THE CONSPIRACIES AND THE HOME
        INVASION AROSE FROM THE SAME TRANSACTION UNDER MCL
        750.110A(8).

V.      WAS DEFENDANT DENIED HIS FEDERAL CONSTITUTIONAL RIGHT
        TO A JURY TRIAL WHERE THE COURT SENTENCED HIM TO A
        CONSECUTIVE SENTENCE FOR HOME INVASION 1st AND
        CONSPIRACY TO MURDER WITHOUT AFFORDING HIM THE
        OPPORTUNITY FOR A JURY DETERMINATION THAT THE
        OFFENSES AROSE OUT OF THE SAME TRANSACTION.

(*See* Def.-Appellant's Br. on Appeal, docket #24.)  Petitioner filed a supplemental *pro se* brief

raising two additional claims:

I.    WAS IT REVERSIBLE ERROR IN VIOLATION IF [SIC] DEFENDANT'S DUE PROCESS RIGHT TO A FAIR TRIAL FOR THE COURT TO ALLOW THE PROSECUTOR TO INTRODUCE THE STAR PROSECUTION WITNESS'S PRIOR CONSISTENT STATEMENT PURSUANT TO MRE 801(d)(1)(b) WHEN THE WITNESS MADE THE PRIOR STATEMENT AT A TIME WHEN HE HAD STRONG MOTIVE TO LIE AND WHEN THE DEFENSE HAD NOT ALLEGED RECENT FABRICATION.

II.    WAS DEFENDANT-APPELLANT DENIED HIS DUE PROCESS RIGHT, BECAUSE THE EVIDENCE AT TRIAL WAS INSUFFICIENT AND NO RATIONAL TRIER OF FACT COULD BE CONVINCED BEYOND A REASONABLE DOUBT OF THE EXISTENCE OF EVERY ELEMENT OF THE OFFENSE.

(*See* Def.-Appellant's Pro Se Supp. Br. on Appeal, docket #24.)  By unpublished opinion issued on November 30, 2004, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 11/30/04 Mich. Ct. App. Opinion (MCOA Op.), docket #24.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same seven claims raised before and rejected by the Michigan Court of Appeals.  By order entered November 2, 2005, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., docket #25.)  The supreme court also denied Petitioner's motion to remand for an evidentiary hearing without prejudice to Petitioner's right to seek post-appeal relief under M.C.R. 6.500 *et seq*.  (*Id*.)

C.    **Post-conviction relief**

Petitioner subsequently filed a motion for relief from judgment in the Kalkaska County Circuit Court raising the following two claims:

I.     DEFENDANT WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS, BECAUSE A PROSECUTION WITNESS COMMITTED PERJURY.

II.    DEFENDANT WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHERE COUNSEL INEFFECTIVELY FAILED TO INVESTIGATE AND CALL A POTENTIAL DEFENSE WITNESS.

The trial court denied Petitioner's motion on August 21, 2006.  Petitioner sought leave to appeal in the Michigan Court of Appeals raising only the perjury claim.  The court of appeals denied Petitioner's application for leave to appeal on March 24, 2008, "because he failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508 (D)."  (*See* 3/24/08 Mich. Ct. App. Ord., docket #26.)  Petitioner presented the same claim in an application for leave to appeal in the Michigan Supreme Court, which also denied Petitioner's application under M.C.R. 6.508(D).  (*See* 10/27/08 Mich. Ord., docket #27)  Petitioner sought reconsideration in the Michigan Supreme Court, but was denied on April 28, 2009.  (*See* 4/28/09 Mich. Ord., docket #27.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United

States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at

- 24 -

411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Id.* at 410.

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

### I.      Ineffective Assistance of Counsel

In his first ground for habeas corpus relief, Petitioner contends that he was denied his Sixth Amendment right to the effective assistance of counsel by his attorney's failure to object to the admission of evidence that Petitioner, when questioned by police after the alleged home invasion, invoked his right to remain silent and stated that he wanted a lawyer.

On the second day of trial, State Police Trooper Thomas George testified regarding the arrest of Petitioner following the home invasion at the residence of Ira Henke and Brent Torrey. George stated in part, "Yeah, I asked him who he was and he told me, and I asked him where Mr. Cron was, and he said he didn't want to talk to me and that he wanted a lawyer, so then he was placed under arrest." (Tr. II, 301.) Petitioner maintains that after George's testimony, he was forced to waive his right to remain silent and testify at trial in order to explain to the jury why he did not want to talk to police and why he did not come forward from the start.

- 25 -

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Furthermore, as the Supreme Court recently has observed, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

Applying the *Strickland* standard, the Michigan Court of Appeals held that trial counsel was not ineffective for failing to make an objection, stating:

> Defendant argues that he was denied the effective assistance of counsel when counsel failed to object to testimony regarding defendant's invocation of the right to counsel and the right to remain silent during police questioning. "The Fifth

- 26 -

Amendment guarantees an accused the right to remain silent during his criminal trial, and prevents the prosecution from commenting on the silence of a defendant who asserts the right." *Jenkins v Anderson*, 447 US 231, 235; 100 S Ct 2124; 65 L Ed 2d 86 (1980). To establish an ineffective assistance of counsel claim, a defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing norms, and (2) that counsel's deficient performance prejudiced the defense. *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). To demonstrate prejudice, the defendant must show that but for counsel's errors, there is a reasonable probability that the result of the proceedings would have been different. *Strickland, supra* at 694; *Pickens, supra* at 314, 326-327.

In *People v Schollaert*, 194 Mich App 158, 164; 486 NW2d 312 (1992), we addressed the issue whether a defendant's constitutional rights are violated by the admission as substantive evidence of testimony concerning a defendant's silence before either custodial interrogation or the giving of *Miranda* warnings. We held that the admission of defendant's silence before a custodial interrogation or *Miranda* warnings did not violate his constitutional rights. *Schollaert, supra* at 166-167; see also *People v Sutton* (*After Remand*), 436 Mich 575, 599; 464 NW2d 276 (1990). Here, defendant did not receive *Miranda* warnings before he requested a lawyer, nor was he subject to custodial interrogation. Thus, the statement was admissible. Under these circumstances, counsel cannot be deemed to have rendered ineffective assistance by failing to raise a futile objection. *People v Milstead*, 250 Mich App 391, 401; 648 NW2d 648 (2002).

(MCOA Op. 2-3) (footnotes omitted.)

In order to assess counsel's performance, the Court must consider Petitioner's underlying Fifth Amendment rights. The Fifth Amendment guarantees "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." The Fifth Amendment's right to silence applies to a defendant in a state court proceeding under the Fourteenth Amendment. *Griffin v. California*, 380 U.S. 609, 615 (1965). In general, a defendant's decision to remain silent cannot be used as substantive evidence of guilt. *Id.* This rule clearly applies to a defendant's silence after the defendant actually invokes the right to remain silent. *See id.; cf. Doyle v. Ohio*, 426 U.S. 610, 619 (1976) (precluding the use for impeachment purposes of a defendant's post-*Miranda*

- 27 -

silence).  However, the Sixth Circuit has observed, "The constitutionality of using a defendant's pre-*Miranda* silence as substantive evidence of guilt [has] not been addressed by the Supreme Court." *Jones v. Trombley*, 307 F. App'x 931, 933 (6th Cir. 2009). The federal circuit courts have split on this issue.  *See Combs v. Coyle*, 205 F.3d 269, 282–83 (6th Cir. 2000) (collecting cases).  While the Sixth Circuit held in *Combs* that pre-*Miranda* silence cannot be used as substantive evidence of guilt, it did so under a pre-AEDPA, de novo standard of review.  *Id.* at 283.  *Combs*, therefore, is not controlling in this case.  *See Hereford v. Warren*, 536 F.3d 523, 532 (6th Cir. 2008).  Moreover, the law is clear that pre-*Miranda* silence may be used to impeach a defendant's credibility as a witness. *Portuondo v. Agard*, 529 U.S. 61, 69 (2000) ("The prosecutor's comments in this case, by contrast, concerned respondent's *credibility as a witness*, and were therefore in accord with our longstanding rule that when a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness." (internal quotation marks omitted; emphasis in original)); *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980) ("We conclude that the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility.").

In this case, Petitioner invoked his right to counsel before he was arrested or given *Miranda* warnings.  Trooper George's testimony did not violate state law, nor did it violate clearly established Supreme Court precedent.  As discussed by the Michigan Court of Appeals, counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004).  Moreover, Petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v.*

- 28 -

*United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).   Trooper George's comment that Petitioner asked for an attorney was not directly responsive to the question asked by the prosecutor, so defense counsel did not have an opportunity to object before the comment was made.   Once George made the comment, counsel may very well have decided not to draw attention to it by raising an objection.   "[N]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint." *United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006).   Consequently, the decision of the Michigan Court of Appeals was not an unreasonable application of *Strickland*.

## II.   **Witness Intimidation**

In his second ground for habeas corpus relief, Petitioner contends that Ryan Hittle and Charles Lee invoked their Fifth Amendment rights and refused to testify in his defense at trial after government officials threatened to prosecute them if they testified.   Respondent contends that while Petitioner properly exhausted his claim with regard to Charles Lee, his claim concerning Ryan Hittle is procedurally defaulted.   Respondent further argues that Petitioner's claim is without merit.

Before the court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts.   28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).   Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim.   *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971).   To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court.   *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *Wagner v. Smith*, 581 F.3d 410, 414 (6th Cir. 2009); *Hafley*

*v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). Petitioner failed to raise his claim with regard to Ryan Hittle on direct appeal or in his motion for relief from judgment. Under Michigan law, a criminal defendant may file only one motion for relief from judgment with regard to a judgment of conviction. *See* M.C.R. 6.502(G)(1). Petitioner, therefore, no longer has an available state-court remedy. "If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred." *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991)), *rev'd on other grounds*, 535 U.S. 635 (2002). Consequently, Petitioner's claim involving Ryan Hittle is procedurally defaulted.

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks* v. Straub, 377 F.3d 538, 551-52 (6th Cir. 2004). The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner does not provide cause for his failure to raise the issue on direct appeal or in his motion for relief from judgment. Petitioner cannot assert ineffective assistance of counsel as cause for his default because Petitioner was not entitled to counsel beyond his initial appeal in the

- 30 -

Michigan Court of Appeals.  *See Coleman*, 501 U.S. at 756-67.  Petitioner's failure to raise the issue with regard to Ryan Hittle in his motion for relief from judgment must be attributed to Petitioner. Ineffective assistance of trial counsel does not excuse a petitioner's own failure to raise all of his claims in a petition for post-conviction relief.  *See Ewing v. McMackin*, 799 F.2d 1143, 1151 (6th Cir. 1986); *see also Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir. 1995) (holding that a prisoners *pro se* status and ignorance of his rights do not constitute cause excusing his failure to raise grounds before the state courts).  Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Moreover, the miscarriage-of-justice exception does not apply because Petitioner has failed to present a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536.[3]  Because Petitioner's claim concerning Ryan Hittle is procedurally barred, the Court will consider his claim only with regard to Charles Lee.

Charles Lee, who had been incarcerated at the Kalkaska County Jail at the same time as Petitioner and Davis, was expected to provide testimony supporting the defense theory that Davis gave false testimony against Petitioner because he did not like Petitioner and wanted to make a deal with the government in exchange for his testimony in this case.  The prosecutor first raised the issue of Charles Lee's Fifth Amendment rights on the third day of trial.  In a separate record made outside the presence of the jury, the prosecutor told the Court that defense counsel and his investigator came to him a week ago asking him to charge Lee with extortion in connection with their investigation in this case.  (Tr. III, 135-36.)  The prosecutor stated in part:

---

[3]While Petitioner presents new evidence in the form of Danny Davis' recantation, the Court finds in Part III, *infra*, that such evidence was inherently unreliable.

Now, I don't know why he [defense counsel] isn't mentionin' that.  But if Charles Lee gets up and testifies, in the course of his testimony, I expect he's gonna admit he tried to extort somethin' out of these people; and he's got a very significant Fifth Amendment issue there.

So, you know, if -- if he did it, and he ends up bein' charged with extortion, and he has it comin', great.  But I -- but as -- as regards the protection that this Court would afford to any witness that testifies, I think that's a very significant issue.

(Tr. III, 136.)  Later that day, in another separate record, the prosecutor informed the court that Lee had written a letter to the defense investigator indicating that he could provide testimony favorable to the defense, but Lee "would forever hold [his] peace" unless the investigator "pull[ed] strings" with regard to outstanding charges against Lee.  (Tr. III, 265.)  Lee further demanded that the investigator "talk to the judge and get [his] probation terminated along with time served."  (Tr. III, 265-66.)  The prosecutor believed that the letter was fair game for cross-examination if Lee testified and opined that Lee could have Fifth Amendment concerns.  (Tr. III, 266-67.)  According to the prosecutor, Lee would be "sticking his head in a noose" if he got on the stand and testified that he wrote that letter with the intent to extort something from the defense.  (Tr. III, 267.)  The prosecutor further opined that if he were Lee's lawyer, he would tell him not to testify, "but if he has competent representation and decides to testify and lets the chips fall where they may, okay, on with it."  (Tr. III, 267.)

Defense counsel denied that he or the investigator who received the letter sought extortion charges against Lee.  Rather, defense counsel wanted to inform the prosecutor that Lee was trying to make a deal and asked the prosecutor to send a detective to interview him.  (Tr. III, 269-70.)  Based upon the interview, the prosecutor did not believe that Lee's testimony would be particularly helpful to the defense and argued that Lee should be advised of his Fifth Amendment rights, stating:

- 32 -

My concern is only this.  I am facing a – a – I think a high likelihood that some criminal charges might be contemplated either here or Wexford County.

*** 

And if he -- if he says no, I waive it, then, I don't have any concerns or issues if his testimony is being used as evidence against him.

I mean, I'm not -- it shouldn't be construed that I am trying to keep him from testifying.  I am trying to make sure that I'm holding up my end of this process.  And if we've got a guy that's en -- engaged in criminal activity, and I'm going to get a chance to question him in open court, I want to make sure I get to use it against him later if it turns into that.  Either me or Mr. Fagerman (phonetic) or whoever might end up with this kind of case.

(Tr. III, 270-71.)  Defense counsel, on the other hand, maintained that Lee's testimony would assist the defense in discrediting Davis' testimony and argued that the prosecutor was improperly threatening Lee with prosecution.  (Tr. III, 272-75.)  The prosecutor clarified that Lee had been interviewed about the letter and previous statements that he had given in the case, but no one had threatened Lee with prosecution. (Tr. III, 275-76.)  The trial court appointed a lawyer to advise Lee of his Fifth Amendment rights.[4]  (Tr. III, 277.)

A separate record was made of Charles Lee's appearance on the fourth day of trial. Lee immediately invoked his Fifth Amendment right to remain silent. (Tr. IV, 42.)  Lee's appointed counsel expressed surprise because Lee had told him the night before that he would testify.  (Tr. IV, 42.)  After conferring with Lee, his counsel informed the court that Lee intended to invoke his Fifth Amendment rights.  (Tr. IV, 44.)  The trial court asked counsel for Lee's grounds for invoking the privilege.  (Tr. IV, 45.)  Counsel responded that he was not aware of any evidence that Lee would offer that would tend to incriminate him.  (Tr. IV, 46.)  The court then directly asked Lee, who

---

[4]The trial court appointed the same lawyer that previously was appointed to advise Ryan Hittle regarding his Fifth Amendment rights.

answered that he was "paranoid" and "nervous" about giving his statement to investigators. (Tr. IV, 46.) The court told Lee that he could not invoke his Fifth Amendment right without a proper reason. (Tr. IV, 45-46.) After further discussion between Lee and his counsel, counsel informed the court that Lee was concerned about being charged with extortion because of a letter that he wrote. (Tr. IV, 47.) Lee confirmed that the letter was the reason for the invocation of his privilege. (Tr. IV, 47.) Defense counsel objected to Lee's invocation of his Fifth Amendment rights because the letter had no direct bearing on Petitioner's case. (Tr. IV, 50.) The court disagreed, finding that the letter would be a major topic of cross-examination. (*Id.*)

The Michigan Court of Appeals rejected Petitioner's claim with regard to Charles Lee, stating:

> Defendant first argues that he was denied due process when the prosecution intimidated a potential defense witness into not testifying at trial. Attempts by a prosecutor to intimidate a proposed witness into not testifying can constitute a denial of due process. *People v Hooper*, 157 Mich App 669, 674-675; 403 NW2d 605 (1987). However, contrary to defendant's assertion, the record establishes that the prosecutor did not intimidate the proposed witness into not testifying. The prosecutor never told the witness that he would be prosecuted if he testified. Instead, the prosecutor advised the court, out of the presence of the witness and jury, that it may need to inform the witness of his rights under the Fifth Amendment. The court questioned the witness outside the presence of the jury, see *People v Poma*, 96 Mich App 726, 732; 294 NW2d 221 (1980), and the witness subsequently asserted his privilege.

> Defendant additionally argues that the witness did not have a valid Fifth Amendment right to assert. However, "testimony having even a possible tendency to incriminate is protected against compelled disclosure." *People v Lawton*, 196 Mich App 341, 346; 492 NW2d 810 (1992); see also *Poma, supra* at 733 (observing that a hearing should be held to determine if a witness "will either properly or improperly claim the protection against self-incrimination" [emphasis added]). Here, the witness had written a letter to defense counsel offering favorable testimony in exchange for defense counsel's procuring the dismissal of various charges pending against the witness. The witness also threatened to not testify if counsel did not comply with his

- 34 -

demands. Given the concern that this could expose the witness to prosecution, e.g., under MCL 750.122(3)(b) referenced by defendant, we reject defendant's argument.

(MCOA Op. 1-2.)

A defendant's right to present his or her own defense witnesses constitutes "a fundamental element of due process." *Washington v. Texas*, 388 U.S. 14, 19 (1967). The right encompasses the Sixth Amendment "right to have compulsory process for obtaining witnesses in [the defendant's] favor." *Id.* at 19-23. In *Webb v. Texas*, 409 U.S. 95, 95-96 (1972), the Supreme Court reversed the petitioner's criminal conviction where the trial court gratuitously and unnecessarily singled out the defendant's only witness for a lengthy admonition the on the dangers of perjury, assuring the witness that if he lied he would be prosecuted and probably convicted of perjury, that the resulting sentence would be added onto the one he was serving and impair his chances for parole. After the warning, the witness refused to testify and was excused by the court. *Id.* at 96. Applying *Washington*, the Supreme Court concluded that the trial court's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment. *Id.* at 98.

The Supreme Court has never held, however, that a defendant has the right to present any and all witnesses. *See Davis v. Straub*, 430 F.3d 281, 290 (6th Cir. 2005). As the Supreme Court stated in *Washington*, "Nothing in this opinion should be construed as disapproving testimonial privileges, such as the privilege against self-incrimination[.]" *Washington*, 388 U.S. at 23 n.21. Governmental conduct must amount to a substantial interference with a witness's free and unhampered determination to testify before we will find a violation of either due process or the Sixth Amendment. *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995) (citation omitted) (holding

that the government's inappropriate interrogation of a defense witness did not "substantially interfere[ ] with any free and unhampered determination the witness might have had as to whether to testify"). Even when such interference occurs, a violation of a defendant's right to call witnesses in his or her defense is subject to harmless-error analysis. *United States v. Foster*, 128 F.3d 949, 953 & n.4 (6th Cir. 1997) (analyzing the standard of review applicable to claims of prosecutorial misconduct based on the alleged intimidation of a defense witness).

Contrary to Petitioner's assertions, the Sixth Circuit's decisions in *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973) and *United States v. Arthur*, 949 F.2d 211 (6th Cir. 1991), do not support the finding of a due process violation in this case. In *Thomas*, the Sixth Circuit found a violation of the Supreme Court's decisions in *Washington* and *Webb* when an assistant U.S. Attorney, through a secret service agent, told a defense witness that he *would be* prosecuted if he testified in the petitioner's case. *Thomas*, 488 U.S. at 335. In support of its finding, the Sixth Circuit stated:

> There is no question but that it was completely unnecessary for the Government to approach the prospective witness. The transcript reveals that both the District Judge and counsel for the co-defendant Thomas went to considerable lengths to advise Asaro [the defense witness] that his decision to testify should be based on full knowledge of the consequences, confirmed through his own counsel. Consequently, the actions of the Assistant U.S. Attorney, through the secret service agent, in seeking out the prospective witness and on an ex parte basis gratuitously admonishing him cannot be viewed as serving any valid purpose, even accepting the assertion of good faith. Further, considering the caution carefully expressed to Asaro in the courtroom, it is difficult not to regard the Government's later out-of-court communication with Asaro as an attempt to intimidate.

*Id.* at 336. Unlike *Thomas,* there are no allegations in this case that the prosecutor, or his agent, engaged in an ex parte communication with Lee and directly threatened him with imminent prosecution if he testified in this case. While a detective interviewed Lee about his letter, the

interview was conducted at defense counsel's request and Lee was not threatened with prosecution during the recorded interview. Moreover, Lee was not present in the courtroom when the prosecutor and defense counsel discussed with the court whether Lee should be advised of his Fifth Amendment rights.

This case also is distinguishable from *Arthur*, in which the petitioner claimed that the trial court induced the witness to invoke his Fifth Amendment rights. The trial court advised the witness of his Fifth Amendment rights and continued to warn the witness of the consequences of testifying. *Arthur*, 949 F.3d at 215. When the witness stated that he wanted to testify, the trial court advised that it was not in the witness's best interest to testify due to the risk of being prosecuted for bank robbery. At that point, the witness invoked his Fifth Amendment right and refused to testify further. *Id.* The Sixth Circuit held that while a trial court has the discretion to warn a witness about the possibility of incriminating himself, an abuse of discretion can occur when the court actively encourages the witness not to testify or badgers a witness into remaining silent. *Id.* at 215-16. The court of appeals concluded that the trial court's repeated warnings and statement that testifying would be against the witness's interest constituted an abuse of discretion. *Id.* at 216. In this case, the trial court appointed counsel to advise Lee of his rights and had no direct contact with the witness until he appeared on the fourth day of trial and was expected to testify. After Lee invoked his Fifth Amendment rights, the trial court allowed him more time to confer with his counsel. The trial court did not encourage Lee not to testify or badger him to remain silent. To the contrary, the trial court pressed Lee to provide a specific reason before allowing him to invoke the privilege.

The facts of this case are comparable with *Davis v. Straub*, 430 F.3d at 287, in which the prosecutor requested a sidebar with the judge and informed the court that the witness was a

suspect and should be informed of his constitutional rights.  The judge questioned the witness briefly and then appointed counsel to advise him of his rights.  *Id.*  Relying on *Webb* and *Thomas*, the Sixth Circuit found that neither the prosecutor nor the trial court's conduct was unconstitutional, especially considering the ethical obligation imposed on prosecutors by the ABA Standards for the Administration of Criminal Justice.  *Id.*  Like *Davis*, the prosecutor raised the issue of Lee's Fifth Amendment rights to the trial court outside the presence of the jury and the witness.  After discussing the issue with the prosecutor and defense counsel, the trial court appointed counsel to advise Lee of his rights.  When Lee was called to testify the following day at Petitioner's trial, he immediately invoked his right to remain silent.  The conduct of the prosecutor and trial court in this case did not rise to the level of intimidation present in *Webb*, *Thomas* or *Arthur*.  Therefore, the Michigan Court of Appeals' decision that the prosecutor did not intimidate Lee into invoking his Fifth Amendment right to remain silent was a reasonable application of Supreme Court precedent.

### III.    Newly Discovered Evidence that Danny Davis Committed Perjury

In his third ground for habeas corpus relief, Petitioner contends that he is entitled to a new trial based on newly discovered evidence that Danny Davis, the key witness for the prosecution, committed perjury at trial.  Petitioner further claims that his due process rights were violated when the prosecutor pressured Davis to provide false testimony against Petitioner in order to obtain a conviction on the conspiracy charges related to Moran's murder.

On October 13, 2004, two years after Petitioner's conviction in this case, Davis wrote a letter to Petitioner's trial counsel, Roderick Cottom, stating that he had "some very important information to tell [him] about [his testimony]," but did not want to provide any further details in the letter.  (Davis Letter to Cottom, Pet. Br. in Supp., docket #2, Ex. D.)  Mr. Cottom gave Davis'

letter to Petitioner's appellate counsel, Patrick Ehlmann, who ultimately met with Davis at the Pugsley Correctional Facility on November 10, 2004. (Ehlmann Aff., Pet. Br. in Supp., docket #2, Ex. F.) Davis told Ehlmann that after his preliminary examination on the criminal sexual conduct charges related to Davis' step-daughter, Prosecutor Brian Donnelly called Davis out of his cell at the Kalkaska County Jail. Davis explained to Donnelly that Petitioner told him that a home invasion occurred with regard to Jamie Moran and that Petitioner went inside to make Cron leave. According to Davis, that was all Petitioner ever told him. Davis claimed that Donnelly asked him to help him out by testifying against Petitioner and that he would tell Davis everything he needed to know. Donnelly allegedly threatened that if Davis did not testify against Petitioner, Donnelly would charge him with multiple counts of CSC and tell the judge that Davis was withholding information in the Moran case so that the judge would give Davis a more severe sentence. In exchange for his testimony, Donnelly allegedly offered Davis a plea to a "lesser" and told him that he would be sentenced to time served. In addition, Donnelly told Davis that he would have to pass a polygraph examination and advised him how to pass. In 2008, Davis signed an affidavit retracting his trial testimony against Petitioner. (Davis Aff., Pet. Br. in Supp., docket #2 Ex. H.) Davis' affidavit was consistent with the statement he gave to Ehlmann.

Petitioner raised this claim for the first time in his motion for relief from judgment brought under MICH. CT. R. 6.500 *et seq*. Under MICH. CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised on direct appeal. For claims that could have been raised, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an

"irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand."  MICH. CT. R. 6.508(D)(3)(a)-(b).  The trial court concluded that Petitioner failed to show good cause or actual prejudice, stating:

> The witness in question first contacted the Defendant's prosecutor on January 25, 2002, claiming to have information relevant to the case.  The witness claimed that he had shared a cell block with the Defendant in jail.  The witness claimed that while in jail together, the Defendant had confessed to conspiring with Cron to murder the victim.  The witness made two written statements on January 25 and 28, 2002 corroborating this story.  The Prosecutor interviewed and video taped the witness verifying the accuracy of his statements on January 30, 2002.  On February 7, 2002, the witness passed a polygraph test concerning the truthfulness of his story.

> On March 12, 2002, the witness sent a letter to the Attorney General repeating the story, stating that he had taken the initiative to reveal it to his attorney and the prosecutor, and that the Defendant had threatened to hurt his family if he revealed the information.  The letter stresses the danger he felt his family was in and that the police and the prosecutor were not doing anything to protect them.  Further, he alleged that his present attorney was friends with the prosecutor and not adequately representing him.  The letter expressed distrust and hostility towards both of them.

> Even so, the witness agreed to plead guilty and testify against the Defendant in exchange for dropping his charges to a single count of criminal sexual conduct in an unrelated case, and for a favorable recommendation at sentencing.  Subject to this agreement, the witness was sentenced to 2 to 15 years for one count of Criminal Sexual Conduct on May 8, 2002. Importantly, he was under oath during both his guilty plea and during his testimony at trial.

> The next day, the witness wrote the prosecutor.  He was upset about his sentence, claiming that the prosecutor had promised to recommend only 12 to 48 months.  It should be noted, that this was the range of the minimum sentence and not the full sentence range under the scoring guidelines.  The Court made this fact clear at the Defendant's sentencing and the Defendant acknowledged that he understood his sentence.  Although the witness was upset the day after sentencing, he never recanted his earlier statements or made any indication that his information on the murder was false.  On October 1, 2002, the witness testified at Defendant's trial.

> The witness was then denied parole in 2003, 2004, and 2005.  Soon after being denied in 2004, the witness told his attorney and a private investigator that his trial testimony was purjured.  Further, he asserted that the prosecutor intimidated him into giving the perjured testimony and taught him how to cheat on a polygraph test.

As stated above, newly discovered evidence satisfied the good cause requirement of MCR 6.508(D)(3). *People v. Davis*, 199 Mich App 502, 515; 503 NW2d 457 (1993). However, where it takes the form of recanted testimony it is traditionally regarded as suspect and untrustworthy. *People v. Canter*, 197 Mich App 550, 559; 496 NW2d 336 (1992). "There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character. Michigan courts have expressed reluctance to grant new trials on the basis of recanted testimony." *Id.* at 559-560 (quoting *Van Den Dreissche*, 233 Mich 38, 46; 206 NW2d 339 (1925)).

Beyond the witness's informal statements, there is no other evidence to support the claim that his testimony was perjured. The witness told a private investigator that he would not make a sworn statement or be recorded unless he is given "full immunity." The witness's wife admitted to the investigator that some of the testimony given in Defendant's trial was perjured, but she refuses to make any official statement out of fear of her husband. It is significant on the one hand that the witness was under oath at trial and during his guilty plea, while on the other hand he informed the investigator that he would only provide a sworn statement conditioned upon full immunity.

On the other hand, there is substantial evidence that the witness's testimony at trial is reliable. The witness made four written statements, passed a polygraph test, and convinced both the judge and jury at trial that his testimony was truthful. Other testimony at trial corroborated the witness's story. Further, the timing of the recant corresponds with the witness's parole denial in 2004, and is consistent with his anger towards the prosecutor and his prior attorneys. Even after expressing dissatisfaction with his sentence on May 9, 2002, he proceeded to offer the alleged testimony six months later.

Based on the strong evidence supporting the witness's trial testimony, the lack of evidence supporting the perjury claim, and the circumstances surrounding the sudden recant two years after Defendant's trial, the court finds that the recanted testimony is unreliable and that the trial testimony was probably truthful. Thus, evidence of recanted testimony probably would not have resulted in the Defendant's acquittal. The Defendant has therefore failed to show good cause or actual prejudice. For that reason, the Defendant's motion is denied as to the recanted witness testimony.

(Ord. Denying Def.'s Mot. for Relief from J., docket #27, 3-6.)

Respondent contends that Petitioner's claim is procedurally defaulted. Here, the

Kalkaska County Circuit Court issued a reasoned decision finding that Petitioner failed to show good

cause and actual prejudice under M.C.R. 6.508(D)(3).  *See Guilmette v. Howes*, 624 F.3d 286, 289-90 (6th Cir. 2010) (absent an explained decision from some Michigan court applying Rule 6.508(D), the federal court may not invoke procedural default to dispose of a habeas claim that has been rejected by the Michigan courts on the grounds of MCR 6.508(D)).  The Michigan Court of Appeals and the Michigan Supreme Court subsequently issued summary orders denying Petitioner's applications for leave to appeal under M.C.R. 6.508(D).  In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence.  *Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000).  Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action.  *See  Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998).  Consequently, Petitioner defaulted his claim in the state courts.

As previously discussed, when a petitioner procedurally defaults his federal claim in state court, he must demonstrate cause and prejudice flowing from the violation of federal law alleged or that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House*, 547 U.S. at 536.  For cause, Petitioner argues that Davis did not come forward until after his appeal had been filed in the Michigan Court of Appeals.  The letter from Davis to Petitioner's trial counsel was dated October 13, 2004, approximately one month before the court of appeals issued its opinion affirming Petitioner's convictions.  I will assume for purposes of the report and recommendation that Petitioner's allegations are sufficient to establish cause for failing to raise the claim on direct appeal.  Because Petitioner has shown cause, the Court must consider prejudice.

- 42 -

Prejudice requires the Petitioner to show that the alleged error "worked to his *actual* and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  Because the prejudice inquiry merges with the substance of Petitioner's claim, I will consider the merits of the claim in determining whether Petitioner has established prejudice for his default.  *See Gajda v. Wolfenbarger*, __ F. App'x __, 2012 WL 2044399, at *1 (6th Cir. June 6, 2012).

   A claim that a habeas petitioner is entitled to relief based upon the failure of a state trial judge to grant him a trial on the basis of newly discovered evidence is not cognizable in a habeas proceeding.  *See Hence v. Smith*, 37 F. Supp.2d 970, 980 (E.D. Mich. 1999).  Moreover, as a matter of law, witness recantation is rarely ground for habeas relief because such recantations are viewed "with extreme suspicion." *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991); *see also Knickerbocker v. Wolfenbarger*, 212 F. App'x 426, 433 (6th Cir. 2007) (same); *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001) (same); *Bower v. Curtis*, 118 F. App'x 901, 908 (6th Cir. 2004) ("Even if accepted, a post-trial recantation is generally not sufficient to grant habeas relief absent constitutional error); *Hence*, 37 F. Supp.2d at 980 ("The posttrial recantation of an accomplice witness also does not warrant habeas relief since such evidence goes to the merits of the conviction, not its legality.").  Absent proof of a claim of a separate constitutional violation in the underlying proceeding, newly discovered evidence of actual innocence is not a ground for habeas relief.  *See Herrara v. Collins*, 506 U.S. 390, 400 (1993).

   Petitioner raises an independent due process claim that the prosecutor knowingly offered false evidence.  "[A] prosecutor may not deliberately deceive 'a court and jurors by [presenting] known false evidence.' "*Rosencrantz v. Lafler*, 568 F.3d 577, 583 (6th Cir. 2009)

(quoting *Giglio v. United States*, 405 U.S. 150, 153 (1972)).  There also is a denial of due process when the prosecutor allows false evidence or testimony to go uncorrected.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false.  *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).  With regard to the first requirement, a habeas petitioner must show that a witness' statement was "indisputably false," rather than misleading.  *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000).  A conviction obtained by the knowing use of perjured testimony must be set aside if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Giglio*, 405 U.S. at 154 (internal quotation marks omitted).  A habeas petitioner has the burden of establishing a *Giglio* violation.  *See Malcum v. Burt*, 276 F. Supp.2d 664, 684 (E.D. Mich. 2003).

In this case, there is no question that Davis' testimony was material to Petitioner's guilt on the conspiracy charges.  However, Petitioner cannot sustain this claim because he has not shown the alleged perjury to be indisputably false.  As discussed at length by the state trial court, Davis' trial testimony was consistent with his letter to the prosecutor dated January 25, 2002, two written statements dated January 25 and 28, 2002, a videotaped interview given on January 30, 2002, and his successful completion of a polygraph on February 7, 2002.  Davis repeated his story again in a letter to the Michigan Attorney General dated March 12, 2002.  Despite Davis' dissatisfaction with the sentence he received in May 2002, he testified for the prosecution at Petitioner's trial in October of that year.  It was not until two years later, shortly after he was denied parole for the second time, that Davis first claimed that he gave perjured testimony.  Thereafter, Davis waited

another four years, until 2008, before he execute an affidavit retracting his trial testimony. As noted by the trial court, there is no direct evidence outside of Davis' own statements that the prosecutor induced him to give false testimony against Petitioner. On the other hand, Davis' trial testimony was consistent with other evidence and testimony given at trial regarding the circumstances of Jamie Moran's murder.

Petitioner contends that Davis' recantation is corroborated by numerous pieces of evidence, including Bill Cron's 2004 affidavit describing his activities on the days relevant to the charges in this case. (Cron Aff., Pet. Br. in Supp., docket #2, Ex. C). Petitioner also cites unsworn, pre-trial interviews conducted by the defense investigator with Kalkaska County inmates Kevin Duddles, Ryan, Hittle, Scott Riplow and Charles Lee, which appear to contradict various details of Davis' story. At best, Petitioner has established mere uncertainty surrounding Davis' veracity, which is not enough to show the prosecution knowingly used perjured testimony or denied him a fair trial. *See Davis v. Burt*, 100 F. App'x 340, 348 (6th Cir. 2004). Because Petitioner failed to establish a violation of his due process rights arising from Davis' trial testimony, he obviously cannot show prejudice for purposes of his procedural default. Likewise, Petitioner the fundamental miscarriage of justice exception does not apply because Davis' recantation does not constitute new reliable evidence of actual innocence. *House*, 547 U.S. at 536. As a result, Petitioner's claim is procedurally defaulted and barred from any further review by the Court.

IV.    **Sufficiency of the Evidence**

In his final ground for habeas corpus relief, Petitioner contends that the prosecutor failed to present sufficient evidence to sustain his convictions for first-degree home invasion, conspiracy to commit kidnapping, attempted kidnapping and conspiracy to commit first-degree murder.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court set forth the standard for challenges based on sufficiency of the evidence, holding that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* This standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. And because both the *Jackson v. Virginia* standard and AEDPA apply to Petitioner's claims, "the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008).

The Michigan Court of Appeals rejected Petitioner's claim of insufficiency of the evidence, stating:

> Viewed in a light most favorable to the prosecution, there was sufficient evidence presented to sustain defendant's convictions. *People v Johnson*, 460 Mich 720, 722-723; 597 NW2d 73 (1999). Contrary to defendant's argument, there was sufficient evidence to sustain defendant's convictions of first-degree home invasion and attempted kidnapping on an aiding and abetting theory given the evidence of William Cron's entry into the trailer where the victim was staying and his attempt to forcibly remove her from the trailer, and given evidence of defendant's acknowledgment of his involvement. The jury could properly choose to reject defendant's exculpatory testimony in assessing witness credibility. *People v Avant*, 235 Mich App 499, 506; 597 NW2d 864 (1999).

> Likewise, there was sufficient evidence to sustain defendant's conspiracy convictions. The prosecutor presented testimony that established defendant's involvement in the subsequent abduction and murder of the victim by conspiring with

- 46 -

Cron. Although defendant challenges this testimony, as noted above, matters of credibility are left to the trier of fact. *Id.*

We reject defendant's argument that because he was taken into temporary custody on September 3, 2001, and the victim was found dead on September 5, 2001, that no agreement could have continued during that time to support a conviction of conspiracy. The offense of conspiracy is complete upon the formation of the agreement. *People v Justice* (*After Remand*), 454 Mich 334, 345-346; 562 NW2d 652 (1997). The fact that defendant was in temporary custody during the period at issue does not automatically negate proof of defendant's involvement in a conspiracy to kidnap and murder the victim.

(MCOA Op. 5.)

The Michigan Court of Appeals' finding of sufficient evidence to support Petitioner's convictions for first-degree home invasion and attempted kidnapping under an aiding and abetting theory was not an unreasonable application of *Jackson*. The elements of first-degree home invasion are: (1) the defendant either breaks and enters a dwelling or enters a dwelling without permission, (2) the defendant either intends when entering to commit a felony, larceny, or assault in the dwelling or at any time while entering, present in, or exiting the dwelling commits a felony, larceny, or assault, and (3) the defendant is armed with a dangerous weapon or another person is lawfully present in the dwelling while the defendant is entering, present in, or exiting the dwelling. *See People v. Wilder*, 780 N.W.2d 265, 269 (Mich. 2010). In order for Petitioner to be convicted of first-degree home invasion as an aider and abettor, the prosecution was required to prove: (1) that first-degree home invasion was committed by Cron; (2) that Petitioner performed acts or gave encouragement that assisted in the commission of first-degree home invasion; and (3) that Petitioner intended the commission of first-degree home invasion or had knowledge that the principal intended its commission at the time he gave aid and encouragement. *See People v. Robinson*, 715 N.W.2d 44, 47-48 (Mich. 2006).

Kidnapping is the willful and malicious, and without lawful authority, forcible or secret confinement of another person against her will.  *People v. Jaffray*, 519 N.W.2d 108, 113 (Mich. 1994); MICH. COMP. LAWS § 750.349.  The elements of forcible seizure kidnapping are: "(1) a forcible confinement of another within the state, (2) done willfully, maliciously and without lawful authority, (3) against the will of the person confined or imprisoned, and (4) an asportation of the victim which is not merely incidental to an underlying crime unless the crime involves murder, extortion or taking a hostage." *People v. Wesley*, 365 N.W.2d 692, 696-97 (Mich. 1984).

An attempt to commit a crime is "(1) an intent to do an act or to bring about certain consequences which would in law amount to a crime; and (2) an act in furtherance of that intent which  . . . goes beyond mere preparation." *People v. Jones*, 504 N.W.2d 158, 164 (Mich.1993), quoting 2 LaFave & Scott, Substantive Criminal Law, § 6.2, p 18; *see also* MICH. COMP. LAWS § 750.92.  In order to establish Petitioner's guilt with regard to attempted kidnapping under an aiding and abetting theory, the prosecution must establish that (1) Cron attempted to kidnap Moran, (2) Petitioner performed acts or gave encouragement that assisted Cron, and (3) the defendant intended the commission of attempted kidnapping or had knowledge that Cron intended its commission at the time he gave aid and encouragement.  *See People v. Carines*, 597 N.W.2d 130, 135 (Mich. 1999).  Furthermore, an aider and abettor's state of mind may be inferred from facts and circumstances including "a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Id.*

Petitioner does not dispute that Cron committed first-degree home invasion when he entered Ira Henke's trailer or that Cron attempted to kidnap Moran during that incident, but Petitioner vehemently argues that the prosecutor presented insufficient evidence that he assisted Cron

in the commission of those offenses or that Petitioner possessed the requisite specific intent with regard to the offenses. Petitioner's argument is refuted by the trial record. Ira Henke testified that after struggling with Cron and getting him pinned down, Henke told Moran to call 911. (Tr. I, 283.) Henke then looked up and saw Petitioner standing in the doorway of the bedroom. (Tr. I, 283.) Henke did not believe he could fight both Cron and Petitioner, so he told Petitioner that he would let Cron go if Petitioner got him out of the trailer. (Tr. I, 329.) Petitioner told Henke to let go of Cron. (Tr. I, 285.) When Henke released Cron, Cron first grabbed Henke, but then let go and ran to Henke's room, where he assaulted Moran. (Tr. I, 287.) Cron grabbed Moran by the arm told her that she was leaving with him whether she liked it or not. Moran told Cron that she did not want to go with him and Henke held on to her so Cron could not take her. Cron eventually gave up and he and Petitioner left without Moran. (Tr. II, 288, 292.) Henke testified that he could have held Cron down until the police arrived if not for Petitioner's interference on behalf of Cron. (Tr. I, 290-91.) Based upon Henke's testimony, the jury could have reasonably concluded that Petitioner gave assistance to Cron with regard to both offenses.

The events leading up to home invasion provide circumstantial evidence of Petitioner's intent to assist *Cron* in the first-degree home invasion and attempted kidnapping. Immediately before the events in Ira Henke trailer, Petitioner went with Cron to the Gurnsey Lake camp ground looking for Moran. Brent Torrey testified that Cron asked him if Moran was at the campsite. (Tr. II, 45.) When Torrey answered "no," Cron asked him if Moran "was f----ing anybody." (Tr. II, 45.) Petitioner then became involved in the conversation and asked if Moran was in the tent where Ricky Phillips was sleeping in a tone that prompted Torrey to say, "Don't be a tough guy." (Tr. II, 48, 77.) Shortly thereafter, Petitioner and Cron left together. (Tr. II, 49.) While Petitioner testified at trial that he had no idea that Cron planned to break into the house or that he

intended to kidnap Moran, Petitioner admitted that he went to Henke's trailer with Cron immediately after they left the camp ground.  (Tr. IV, 114-16.)  Petitioner further testified that he went inside the trailer and told Henke to release Cron.  (Tr. IV, 116-19.)  Petitioner testified that he told Henke to release Cron so that Petitioner could get Cron out of the trailer (Tr. IV, 119), but there was no testimony from Petitioner that he encouraged Cron to leave the trailer or that he took any action to prevent Cron from taking Moran.  Rather, Henke testified that he held on to Moran to prevent Cron from taking her against her will.   In light of events leading up to the home invasion and attempted kidnapping, the jury could reasonably infer that Petitioner intended to help Cron locate and kidnap Moran.

Petitioner also challenges the sufficiency of evidence with regard to his conspiracy convictions.  The elements of conspiracy are: (1) the defendant intended to combine with another person; and (2) the participants intended to accomplish an illegal objective.  *People v. Mass*, 628 N.W.2d 540, 549 (Mich. 2001). The prosecutor was required to prove that the parties "specifically intended to further, promote, advance, or pursue an unlawful objective."  *People v. Justice (After Remand)*, 562 N.W.2d 652, 658 (Mich. 1997).   A conspiracy is complete upon formation of the agreement; therefore, no overt act in furtherance of the conspiracy must be shown to support a conviction. *People v. Cotton*, 478 N.W.2d 681 (Mich. Ct. App. 1991).  "The conspiracy continues until the common enterprise has been fully completed, abandoned, or terminated." *People v. Martin*, 721 N.W.2d 815, 841 (Mich. Ct. App. 2006) (internal quotation omitted).  Proof of a conspiracy may be derived from the circumstances, acts, and conduct of the parties during the crime, and inferences are permissible. *Justice*, 562 N.W.2d at 658.  Minimal circumstantial evidence is sufficient to prove intent.  *People v. Fennell*, 677 N.W.2d 66, 72 (Mich. Ct. App. 2004).

To convict a defendant of first-degree murder, the prosecutor must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate. MCL 750.316(1)(a); *People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995). The elements of a conspiracy are: (1) the specific intent to combine with another individual and (2) the specific intent to jointly pursue a criminal objective. *See Justice*, 562 N.W.2d at 657-58. To prove a conspiracy to commit murder, it must be established that each of the conspirators have [sic] the intent required for murder and, to establish that intent, there must be foreknowledge of that intent. Foreknowledge and plan are compatible with the substantive crime of first-degree murder as both the crime of conspiracy and the crime of first-degree murder share elements of deliberation and premeditation. Prior planning denotes premeditation and deliberation. *People v. Hammond*, 466 N.W.2d 335, 337 (Mich. Ct. App. 1991). For conspiracy to commit kidnapping, the prosecution is required to prove (1) that the defendant intended to combine with others, and (2) that the conspirators intended to accomplish the illegal objective and their intended conduct included the elements of kidnapping. *See Mass*, 628 N.W.2d at 549.

Prosecution witness Danny Lee Davis provided key testimony with regard to the conspiracy charges. Davis testified that he was in the same cell block with Petitioner in the Kalkaska County Jail in November 2001. (Tr. II, 195, 241.) Petitioner initially told Davis that he was in jail for home invasion involving Jamie Moran. (Tr. II, 198.) Petitioner told Davis that he and Cron were worried about Moran turning them in for dealing drugs. (Tr. II, 201.) Petitioner stated that after the failed attempt to take Moran from the trailer, they decided to get her coming home from work. (Tr. II, 204, 262-63.) According to Petitioner, Cron and a friend planned to wait by her workplace, while Petitioner and a friend of his waited over by her house in case she got past Cron. (Tr. II, 204.) The plan was to take Moran to a park in Rapid City, give her a lethal dose of drugs and make it look like

she drove herself into the river.  (Tr. II, 204-05.)  Petitioner told Davis that they met in the park as

planned, but Cron left with Moran when another car pulled into the parking lot.  (Tr. II, 206.)  At that

point, Moran was drugged, but alive. (Tr. II, 206.)  Petitioner indicated that the drugs were provided

by Ryan Hittle, but Hittle refused to deliver the lethal dose himself.  (Tr. II, 217-18, 258.)  Later,

when Davis and Hittle were cellmates, Hittle confirmed that he refused to overdose Moran, but

admitted to giving "them" some drugs.  (Tr. II, 217, 259.)  Davis' testimony provided sufficient

evidence that Petitioner formed a plan with Cron and Hittle to kidnap and murder Moran.  While

Petitioner vigorously attacks Davis' credibility, issues of credibility may not be reviewed by the

habeas court under the AEDPA standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).

Furthermore, circumstantial evidence and inferences arising from the evidence may

establish the existence of the conspiracy.  *Martin*, 721 N.W.2d at 840.   As previously discussed,

there was sufficient evidence that Petitioner aided and abetted Cron in the home invasion and

attempted kidnapping of Moran from the trailer.  Scott Riplow confirmed that Petitioner was aware

that Cron intended to kill Moran before they went to Henke's trailer.  (Tr. IV, 20-23.)  On their way

to the trailer, Cron made six calls to Ryan Hittle's residence, although Petitioner told Simpson that

Cron was making to calls to other people.  Petitioner admitted at trial that he was not entirely truthful

with Detective Simpson when Simpson interviewed him about the home invasion.  (Tr. IV, 93-95,

137-38.)   Simpson testified that Petitioner gave him inconsistent stories about the events of

September 2 and 3, before finally admitting that he was at a party at Ryan Hittle's house that was

attended by several people, including Cron.  Petitioner maintained that Moran never came to Hittle's

house that night, despite testimony to the contrary from Henke, Corner and Sizemore.  (Tr. I, 274-76;

Tr. II, 115; Tr. III, 190; Tr. IV, 94, 55-56, 63.)  In addition, Petitioner went to Hittle's house a couple

of hours after he was released from jail on the afternoon of September 4, and stayed there until after

midnight.  (Tr. IV, 129-132.)  When officers went to Petitioner's home at 1:25 a.m. on September 5, Petitioner told them that Cron had gone down state.  (Tr. III, 8.)  When asked how he knew that, Petitioner would not give a specific source.  (Tr. III, 8-9.)  Petitioner's participation in the home invasion and attempted kidnapping of Moran on September 3, his close contact with Cron and Hittle during the period of September 3 through 5, and his dishonesty with Dectective Simpson, provided strong circumstantial evidence of his involvement with Cron and Hittle in a conspiracy to kidnap and murder Jamie Moran.

Petitioner contends that because he was arrested on September 3 and held in jail until the following evening, he could not have participated in a conspiracy to kill Moran.  However, as previously discussed, the agreement to kidnap and murder Moran occurred before Petitioner's arrested on September 3.  Because the crime of conspiracy is complete upon the formation of the agreement, Michigan law does not recognize an abandonment defense for the crime of conspiracy. *See Cotton*, 478 N.W.2d at 689 ("The crime of conspiracy is complete upon the formation of the agreement . . . .  Moreover, withdrawal from the conspiracy is ineffective because the heart of the offense is the participation in the unlawful agreement."); *People v. Juarez*, 404 N.W.2d 222, 225 (Mich. Ct. App. 1987) ("A withdrawal from a conspiracy is ineffectual.").  So long as Petitioner participated in the agreement to kidnap and murder Moran, he could be convicted of conspiracy regardless of whether he was present for or participated in the underlying offenses. *See Cotton*, 478 N.W.2d at 689.  Furthermore, Plaintiff was released from jail at approximately 5:40 p.m. on September 4 and was not seen again by police until approximately 1:25 a.m. on the morning of September 5.  (Tr. III, 28-29, 7-8.)  Moran was last seen by Standfest on the evening of September 4 and she was found in the Torch River at 7:00 a.m. on September 5.  (Tr. II, 101-05; Tr. III, 38.)  Petitioner, therefore, could have directly participated in the events leading up to Moran's death.

Consequently, under the deferential AEDPA standard for claims of insufficiency of the evidence, I find that Michigan Court of Appeals' finding of sufficient evidence on the conspiracy charges was a reasonable application of *Jackson*.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied. I further recommend that the Court grant Petitioner a certificate of appealability. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).


Date:  August 29, 2012                               /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge



### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).